IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **J.R.B. & LEE ANN BOYER** | : | |
| | : | |
| v. | : | **CIVIL ACTION** |
| | : | **NO. 23-373** |
| **QUAKERTOWN COMMUNITY** | : | |
| **SCHOOL DISTRICT** | : | |

**McHUGH, J.**                                                                                                    **July 8, 2024**

### MEMORANDUM

This is a challenge to an administrative decision under the Individuals with Disabilities Education Act (IDEA), brought by a parent proceeding *pro se*. The student, J.B., has an "emotional disturbance" disability that causes him on occasion to act out aggressively. In September 2020, at the start of his kindergarten year, the Quakertown Community School District began a "trial" of regularly removing J.B. from his classroom to receive one-on-one support. That approach was tried for approximately one month. Although the District communicated with J.B.'s parents once the trial began, it failed to notify the parents beforehand, did not incorporate the parents' input about the trial, and did not complete a timely update to J.B.'s individualized education plan.

The District's shortcomings led J.B.'s mother to file an administrative due process complaint with the Pennsylvania Department of Education. She claimed that, as a result of the trial, the district failed to provide J.B. with a free appropriate public education (FAPE) in violation of the IDEA. Although a state hearing officer agreed with J.B.'s mother that the District violated the IDEA's procedural requirements, the officer also found no substantive violation of the IDEA and therefore no denial of J.B.'s FAPE. J.B.'s mother, Mrs. Lee Ann Boyer, now challenges that finding. She also asserts claims against the District under the Fourth Amendment, the Americans with Disabilities Act, and Pennsylvania state law.

After carefully reviewing the record, I share the Hearing Officer's conclusion as to the IDEA claim. The school district may have committed notable procedural missteps in conducting its "trial," but it did not deny J.B. his right to a free appropriate public education. I further conclude that there is not sufficient evidence to support Mrs. Boyer's additional claims. I commend J.B.'s parents' considerable efforts to provide their son with the best possible education, but I must grant the District's motion for summary judgment and dismiss this action.

I.  Relevant Factual Background

*Start of the 2020-2021 School Year*

In September 2020, J.B. and his twin brother began kindergarten in the Quakertown Community School District. Before the school year began, J.B. was evaluated and found eligible for special education services due to an "emotional disturbance" and speech impairment. LEA Ex. S-2 at 15 (ECF 14-8). The District and J.B.'s parents agreed to an individualized education plan (IEP), under which J.B. would attend full-day kindergarten with supplemental programming in an emotional support classroom. LEA Ex. S-5 at 7-8. The IEP also called for J.B. to spend the majority of the school day in his regular classroom. Hearing Tr. at 169:12-171:1 (ECF 14-6).

In his first weeks of school, J.B. experienced multiple episodes of aggressive behavior toward other students in his regular classroom, including hitting, kicking, biting, and throwing objects. *Id.* at 158:1-18. On September 29, the District contacted J.B.'s mother for permission to conduct a new behavioral assessment and to evaluate J.B. for occupational therapy and speech services. LEA Ex. S-6 at 1-4. Mrs. Boyer agreed. *Id.* at 3-4. School staff also decided among themselves to conduct a temporary "trial," during which J.B. would spend significantly more time working one-on-one with a behavioral support specialist in "less stimulating environments" in the school. Hearing Tr. at 153:23-154:24, 156:7-8, 160:13-23. Instead of his regular classroom, J.B.

would spend the majority of the day in some combination of the school's emotional support classroom, a conference room, a hallway inside the main office, or a room called the "serenity space." *Id.* at 156:11-20, 157:14-23.  No formal notice was sent to J.B.'s parents about the trial.

*The Trial Begins: October 1 to October 21*

The trial began on October 1.  That same day, J.B.'s behavioral support specialist, Darci Gregor, wrote home to J.B.'s parents: "We changed his schedule a bit to work in a quiet location separate from [J.B.'s classmates], which helped him to concentrate."  Parent Ex. P-6 at 4 (ECF 14-9).  Mrs. Boyer responded with confusion, underscoring her lack of prior knowledge about the change.  She emailed Ms. Gregor on October 2: "Was [J.B.] in the regular classroom yesterday and today?  He told me, 'He's in a room all day with just a table and a teacher' . . . . Not sure what is true."  Parent Ex. P-13 at 4.

Three days later, on October 5, Ms. Gregor wrote to J.B.'s parents with greater detail about the trial:

> [J.B.] and I have been working in a smaller area with less distractions/items to help see if the reduced stimuli would benefit him, and so far, I feel that his behaviors are much improved.  We are able to structure his environment in a way that is very routine and limits distractions, which allows us to really start to develop the behavioral skills he will need to more appropriately access his regular education classroom . . . .  In this separate space, I can work on developing a stronger relationship with [J.B.] in order for us to slowly push him back into the classroom when he is more ready for it.  So far, I think [J.B.] has appreciated the change and is continuing to share more about himself and his feelings each day, which is a huge success.

*Id.* at 5.  Mrs. Boyer replied with apparent approval: "Thank you.  [J.B.'s brother] needs you too which I stated in his IEP meeting.  I am glad you are able to see how good [J.B.] can be."  *Id.*

In communications over the following days, Mrs. Boyer began to raise concerns to Ms. Gregor about the trial.  On October 6, Mrs. Boyer wrote: "FYI, He told me, 'the room he is in is

3

like a jail without bars' and the 'room is in the Principal's office.' Therefore he is being sent there as a punishment." Parent Ex. P-6 at 8. And on October 9: "Is he transitioning to the regular classroom on Tues[day]? If so what classes?" *Id.* at 10. At other moments, however, Mrs. Boyer seemed to indicate her apparent approval of the trial. On October 12, Ms. Gregor wrote to Mrs. Boyer: "[J.B.] is in his classroom currently for lunch and recess. Today, he did excellent during lunch but struggled to transition back to his other space." *Id.* at 12. Mrs. Boyer replied, "I talked to him. 'He doesn't want to be in [] his other space.' That is why he struggled. I explained to him what he needs to do to earn his way back to his classroom. Can you explain to him also if he does X, Y, Z, he will earn more classroom time but, if he does a, b, c, these behaviors he won't so 'what does he want + what does he need to do?' Thank you." *Id.*

On October 21, J.B.'s "IEP team" met with Mrs. Boyer, and the District formally notified her that it was "trialing a less stimulating environment for instruction." Hearing Tr. at 107:11-108:3. Mrs. Boyer agreed that the trial should continue, although she later claimed the full details of the trial were not shared with her during the meeting. *Id.* at 109:6-21.

*The Trial Continues: October 21 to November 23*

Following the October 21 meeting, as the trial continued, J.B.'s parents began to express increased concern to J.B.'s teachers. The parents voiced particular disagreement with the use of the "safe room," which the District called the "serenity space." Hearing Tr. at 210:15-24. The District attempted to schedule another meeting with the parents to discuss their concerns. On October 27, Ms. Gregor emailed J.B.'s parents:

> As you know, our school team decided to trial a new intervention with [J.B.] wherein we worked with him independently in a less stimulating environment. Based on your concerns about this and what we've reflected on as a school team, we think it may be beneficial to have another short meeting to discuss this change and what the process going forward is to best meet [J.B.]'s needs in regard to his

4

placement.  This way, we can all be on the same page as a team and have it thoroughly reflected in his IEP.

Parent Ex. at P-13 at 6.  Mrs. Boyer replied the following day:

> The IEP meeting to discuss the change in his IEP should of happened before you made the changes not two and a half weeks later.  The school is violating his IEP.  Yes, I have concerns.  First, his change in placement/IEP should not have happened without having a meeting first to discuss it and me agreeing upon it.  Not the school requesting a meeting after a change was made almost 3 weeks ago.  Second, not only did you do it without my permission you didn't even tell me you did it and what you did.  I had to find out from the boys.  Third, I was never told all the details of where his placement was.  Forth (sic), he is not [in] the least restrictive environment . . . .  Fifth, the nature of where you put him.  You placed him in a hallway, next to the/"in the" Principal's office and [] outside the door of a padded room where "bad kids go" and that is "a jail with no bars."  I never would of agreed to that.  That can be mentally damaging to a child . . . .

*Id.* at 7.  Confrontational communications of this nature continued between J.B.'s parents and the District into November.

On November 23, a follow-up meeting was held between Mrs. Boyer, the District's IEP team members, and counsel for both parties.  The District described the various locations where J.B. had received instruction outside his regular classroom and conceded that it "missed the mark with appropriate communication" regarding J.B.'s placement.  Hearing Tr. at 113:5-17; Parent Ex. P-1 at 9.  The District also confirmed that since the start of November, J.B.'s teachers had allowed him to choose where he preferred to work during the school day.  Hearing Tr. at 114:21-23.  Lastly, the District and Mrs. Boyer agreed that allowing J.B. to choose his placement was an appropriate approach, and that the District should gradually reintroduce J.B. to his regular classroom, as opposed to a full and immediate return.  *Id.* at 119:10-120:2.

*Issues Post-Trial*

J.B.'s kindergarten year resumed according to the agreement of his parents and the District. In November and December, the District updated J.B.'s IEP, re-evaluated him, and began occupational therapy and speech services. Mrs. Boyer approved J.B.'s updated IEP in December, which stated: "Mrs. Boyer shared that she is happy with the plan and feels that [J.B.] will make a lot of progress . . . ." LEA Ex. S-9 at 20.

Although J.B.'s behavior may have generally improved as the school year went on, he continued to experience episodes of aggression toward others. On three occasions in the spring of 2021, school staff employed temporary "restraining techniques" to prevent J.B. from hurting himself or others. LEA Exs. S-10 at 4; S-16 at 1-3. In each of these instances, the District notified Mrs. Boyer and documented the incident. Hearing Tr. at 91:8-24; 93:10-22. Mrs. Boyer contends that J.B.'s behavior worsened in the spring due to the return of Ms. Gregor, who had been absent for several months on maternity leave. Hearing Tr. at 56:12-19. Finally, at the conclusion of the school year, Mrs. Boyer removed J.B. from the Quakertown Community School District to home-school him instead.

*Due Process Hearing and Procedural History*

In June 2022, Mrs. Boyer requested a state administrative due process hearing, claiming the District denied J.B. his right to a FAPE during the 2020-2021 school year. Hearing Tr. at 56:2-19. Mrs. Boyer sought reimbursement for out-of-pocket expenses related to J.B.'s occupational therapy and home-schooling, as well as for attorneys' fees, and she wanted the District to explain to her "why they did what they did." *Id.* at 56:20-57:24.

A due process hearing was held on August 11, 2022 before Hearing Officer Charles Jelley, Esq. The Hearing Officer heard testimony from Mrs. Boyer, Carrie Staffieri (the District's

6

Supervisor of Special Education), and Zach Garger (the Acting Principal of Pfaff Elementary School). On October 2022, the Hearing Officer issued a written determination that the District did not deny J.B. a free and appropriate public education under the IDEA and denied Mrs. Boyer's claim. H.O. Decision (ECF 14-3).

In January 2023, Mrs. Boyer filed this action *pro se* on behalf of J.B., challenging the Hearing Officer's decision and alleging "civil rights violations" against the District and specific administrators and teachers. ECF 1. The defense moved to dismiss, and I granted dismissal as to the individual defendants, denied dismissal as to the IDEA claim, and granted Mrs. Boyer leave to re-plead the "civil rights violations" against the District with more specificity. ECF 7. Mrs. Boyer filed an amended complaint – styled as "Amendments to my claims" – which articulated claims under the Fourth Amendment, the Americans with Disabilities Act (ADA), and various Pennsylvania statutes. ECF 9. After a period of discovery, the District filed this motion for summary judgment as to all claims. ECF 23.

## II.     Legal Standard

In reviewing a state hearing officer's administrative decision under the IDEA, the district court applies a "modified *de novo* standard of review." *D.K. v. Abington Sch. Dist.*, 696 F.3d 233, 243 (3d Cir. 2012). Federal courts cannot "impos[e] their own view of preferable educational methods on the states," so they must afford "due weight" to the hearing officer's findings in a due process hearing. *D.S. v. Bayonne Bd. of Educ.*, 602 F.3d 553, 564 (3d Cir. 2010). "Due weight" means that "[f]actual findings from the administrative proceedings are to be considered prima facie correct, and if the reviewing court does not adhere to those findings, it is obliged to explain why." *Id.* (cleaned up). Under the IDEA, "the party challenging the administrative decision bears the burden of persuasion before the district court as to each claim challenged," *Ridley Sch. Dist. v.*

7

*M.R.*, 680 F.3d 260, 270 (3d Cir. 2012), though the court must make its own findings by a preponderance of the evidence. *Shore Reg'l High Sch. Bd. of Educ. v. P.S. ex rel. P.S.*, 381 F.3d 194, 199 (3d Cir. 2004).

As for Mrs. Boyer's additional, non-IDEA claims, a court must review them under the well-established standard for summary judgment set forth in Federal Rule of Civil Procedure 56(a). *See Le Pape v. Lower Merion Sch. Dist.*, 103 F.4th 966, 983 (3d Cir. 2024) (reiterating that "the Supreme Court has required district courts to apply modified *de novo* review only in their review of IDEA claims"). Under this rule, a district court must grant summary judgment "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court views the facts in the light most favorable to the non-moving party and determines whether there is a genuine issue for trial. *Le Pape*, 103 F.4th at 979.

### III. Discussion

Mrs. Boyer challenges the Hearing Officer's decision that the District did not deny J.B. his right to a FAPE under the IDEA. She also claims the District committed "civil liberties violations" against J.B. under the Fourth Amendment, the ADA, and Chapter 6400 of the Pennsylvania Code. I will address each of these claims in turn.

#### A. IDEA

Under the IDEA, states receiving federal education funding must "make available a free and appropriate public education to all children with disabilities residing within their borders." *D.S. v. Bayonne Bd. of Educ.*, 602 F.3d at 556 (citing 20 U.S.C. § 1412(a)(1)). A FAPE "consists of educational instruction specially designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child 'to benefit' from the instruction."

*Hendrick Hudson Dist. Bd. of Educ. v. Rowley*, 458 U.S. 176, 188-89 (1982).[1] The "core" of the IDEA is collaboration between parents and schools to provide a FAPE, and the IEP is the "central vehicle" for this collaboration. *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 53 (2005); *see also* 20 U.S.C. §§ 1412(a)(4), 1414(d). "Each IEP must include an assessment of the child's current educational performance, must articulate measurable educational goals, and must specify the nature of the special services that the school will provide." *Schaffer*, 546 U.S. at 53 (citing 20 U.S.C. § 1414(d)(1)(A)).

The IDEA also empowers parents to file a complaint for "any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child[.]" 20 U.S.C. § 1415(b)(6). These complaints are heard in a due process hearing, following the applicable state's procedures. 20 U.S.C. § 1415(f)(1)(A). In Pennsylvania, an impartial hearing officer presides. *Mary T. v. Sch. Dist. of Phila.*, 575 F.3d 235, 240 (3d Cir. 2009). At the conclusion of the hearing process, an aggrieved party can then challenge the decision in federal court through a civil proceeding. *Id.*; 20 U.S.C. § 1415(i)(2). In reviewing the hearing officer's decision, the district court must receive the record of the administrative proceedings, hear additional evidence at the request of the parties, base its decision on the preponderance of the evidence, and grant such relief as it deems appropriate. 20 U.S.C. § 1415(i)(2)(C).

Mrs. Boyer claims the District "violated" J.B.'s IEP by failing to adhere to it. "When a party challenges the implementation of an IEP, the heart of the issue is whether any deviation

---

[1] "The term 'free appropriate public education' means special education and related services that— (A) have been provided at public expense, under public supervision and direction, and without charge; (B) meet the standards of the State educational agency; (C) include an appropriate preschool, elementary school, or secondary school education in the State involved; and (D) are provided in conformity with the individualized education program required under [20 U.S.C. § 1414(d) ]." 20 U.S.C. § 1401(9).

whatsoever from an IEP necessarily violates the IDEA, and – if not – how far is too far." *Abigail P. v. Old Forge Sch. Dist.*, No. 22-1680, op. at 13-14, — F.4th —, — (3d Cir. June 26, 2024) (cleaned up).  The Third Circuit has recently explained that "the text of the IDEA counsels against making minor implementation failures actionable given that 'special education and related services' need only be provided '*in conformity with*' the IEP." *Id.* (cleaned up).  Instead, "[a] materiality standard 'affords local agencies some flexibility' while still 'hold[ing] those agencies accountable for material failures and for providing the disabled child a meaningful educational benefit.'" *Id.* (citation omitted).

After a full hearing and submission of evidence, the Hearing Officer in this case found a "three-fold procedural violation" of the IDEA's requirements.  First, the District failed to provide prior written notice to J.B.'s parents about its trial.  Second, the District failed to timely convene an IEP meeting to discuss the trial.  And third, the District failed to seek "meaningful Parental input" before and during the trial. H.O. Decision at 13-14.  The Hearing Officer then emphasized that "not all procedural violations are a denial of a FAPE."  *Id.* at 14.  Rather, "a procedural violation is actionable under the IDEA *only if* it results in a loss of educational opportunity for the student, seriously deprives parents of their participation rights, or causes a deprivation of educational benefits." *Ridley Sch. Dist. v. M.R.*, 680 F.3d 260, 274 (3d Cir. 2012) (cleaned up); 20 U.S.C. § 1415(f)(3)(E)(ii).  The Officer concluded that the District's procedural violations did not meet this threshold and therefore did not deny J.B. a FAPE.  I find ample support in the record for the Hearing Officer's conclusion that the District did not so fundamentally change J.B.'s educational program or depart from his IEP as to deny him a FAPE.

First, the "trial" was relatively short, lasting only a few weeks during J.B.'s full school year.  The District met with Mrs. Boyer to discuss the trial less than three weeks after it began, at

10

which time Mrs. Boyer agreed that it should proceed, acknowledging that she may not have fully understood its details. And at the November IEP meeting, Mrs. Boyer agreed it was appropriate for J.B. to choose whether to work outside his regular classroom, which the District had already been allowing him to do since early November.

Second, although it did so inadequately, the District communicated with J.B.'s parents throughout the trial. J.B.'s emotional support specialist notified the parents on the first day of the trial that J.B. was working outside of his regular classroom, and she described the trial to them in greater detail a few days later. In multiple responses to this specialist, J.B.'s parents expressed approval of the trial. The District also actively sought to re-evaluate J.B. and scheduled meetings with J.B.'s parents throughout, and Mrs. Boyer acknowledged at the due process hearing that her own schedule delayed a follow-up IEP meeting. Hearing Tr. at 80:2-9.

Third, the trial provided J.B. with more services than he would have received in his regular classroom, including one-on-one attention and instruction from a behavioral support specialist. There is no evidence that J.B.'s educational experience suffered during or as a result of the trial. The IEP in place during the trial already permitted the District to pull J.B. from his regular classroom for certain supplemental instruction and for acute behavioral episodes, and J.B. continued to join his classmates for lunch, recess, and "specials" even during the trial. Hearing Tr. at 171:2-15. The record also does not support Mrs. Boyer's prior claims that J.B. spent entire school days alone inside the "safe room." Tellingly, once he was given the option to return to his regular classroom full-time, J.B. chose to continue working one-on-one in the behavioral support classroom or hallway for all or part of his school day. And in the November 23 IEP meeting, Mrs. Boyer agreed to a gradual transition to full-time classroom instruction.

11

The Hearing Officer's findings were reasonable and well-supported by the record.[2] Mrs. Boyer has not met her burden to articulate how the District denied J.B. his right to a FAPE, and I concur with the Hearing Officer's conclusion as to the IDEA claim.[3]

### B. Fourth Amendment

Separate from her IDEA claim, Mrs. Boyer alleges that the district and its teachers violated J.B.'s rights under the Fourth Amendment by "putting him in the 'safe room' and holding the door shut preventing him from leaving," as part of what she labels "aversive therapy."[4] ECF 9 at 3. I find that the evidence cannot sustain this Fourth Amendment claim.

The Fourth Amendment guarantees the "right of the people . . . against unreasonable searches and seizures." U.S. Const. amend. IV. In the context of a student in a public school, the question is whether the school or district acted reasonably in light of all the circumstances, giving "special consideration to the goals and responsibilities of our public schools." *Shuman ex rel. Shertzer v. Penn Manor Sch. Dist.*, 422 F.3d 141, 148 (3d Cir. 2005).

In this case, the evidence on the record establishes the following facts as undisputed. The "safe room" (or "serenity space") was a designated room in J.B.'s school for students experiencing

---

[2] Both parties submitted expert reports to supplement the administrative record, purportedly addressing whether the District's actions were generally appropriate. Neither was illuminating, and I found them unnecessary under the controlling standard of review, as the record amply supports the Hearing Officer's conclusions.

[3] A disproportionate part of the Hearing Officer's analysis focuses on whether removing JB from the classroom was a "change in placement" that would have required notice to the parents. He concludes it was not, extrapolating from *DeLeon v. Susquehanna Community School District,* 747 F.2d 149 (3d Cir. 1984). I find his reading of that case somewhat aggressive, but that does not alter my view of the ultimate result. Regardless of whether this represented a change of placement, the violation would once again be procedural in nature, with the essential point remaining that J.B. was in no way worse off from an educational standpoint because of the trial.

[4] Mrs. Boyer does not invoke 42 U.S.C. § 1983, but this is necessarily the statute through which she brings her Fourth Amendment claim. She alleges this claim against the school district – under a "failure to train" theory of liability – and seemingly against J.B.'s teachers, although she does not specify which teachers.

12

behavioral episodes to calm down or "self-regulate." Dist. Responses at 3 (ECF 23-3). The room was intentionally sparse to reduce stimulation. Hearing Tr. at 156-157:1-6. Although it is unclear how many times J.B. was placed in this room or for how long each time, J.B. was only ever brought to the room to receive one-on-one support from a teacher in a "less stimulating environment," or to "de-escalate" after an acute behavioral episode (such as J.B.'s refusal to get on the bus or his "unprovoked assault on another student" and subsequent attempt to elope). Dist. Responses at 3-4; Hearing Tr. at 199:5-15. J.B. was accompanied by a teacher at all times while in the room, with one notable exception: J.B.'s emotional support specialist – who was pregnant – briefly left the room on some occasions while J.B. remained inside, out of concern for her personal safety when J.B. became aggressive toward her. Dist. Responses at 4-5; Hearing Tr. at 236:10-22, 157:7-9, 178:6-16 (noting teacher's return from maternity leave). When she did leave the room, she remained on the other side of the door and maintained observation and communication with J.B. through a window. Dist. Responses at 5, 22; ECF 25-3 (photo of window). In at least one of these instances, the teacher also held the door handle to prevent J.B. from opening the door and leaving the room, and at some point, she and another teacher directed J.B. to stand with his back against the far wall of the room as they stood in the doorway. Dist. Responses at 22.

Given the frequency and severity of J.B.'s documented episodes and behavioral challenges – which sometimes included biting, hair pulling, and punching other children and teachers – no jury could find that the District acted unreasonably by utilizing the "safe room" to temporarily remove J.B. from others, reduce his stimulation, and prevent his access to potentially dangerous materials in other classrooms. The District had the extremely difficult task of balancing J.B.'s and his parents' wishes against their need to keep him and others safe while furthering his educational development. And although it is regrettable that J.B. was temporarily alone in the room in at least

13

one instance, no jury could find it unreasonable for a pregnant teacher to briefly remove herself out of concern for her safety, especially as she maintained her observation and communication with J.B. through the window.  Likewise, no jury could find it unreasonable to hold the door handle to prevent a kindergarten student from leaving the room on his own accord as he experienced an emotional episode, or to direct him to back away from teachers after becoming physically aggressive.  It is, of course, deeply unfortunate that J.B. developed such negative associations with the "safe room," and it is understandable that his parents opposed the district's use of this room, especially given the District's communication failures during the trial.  But the District's undisputed conduct on the record cannot support a Fourth Amendment claim.[5]

In her original complaint, Mrs. Boyer also noted the District's use of "restraining techniques" on J.B., as part of her broad "civil rights" claim.  ECF 1.  It is undisputed that teachers restrained J.B. on three occasions during the 2020-2021 school year.  The uncontested details about these restraining events are as follows:

> 02/24/2021 – During a transition to the sensory room, JRB eloped and ran toward another student.  JRB began to grab her hair and kick her unprovoked.  He was also screaming.  A substitute teacher . . . and the Principal . . . used a transport restraint lasting one minute or less.  Both the substitute and principal were trained in de-escalation techniques and safe physical restraints . . . .
>
> 05/27/2021 – A special education teacher . . . and special education aide . . . used a transport restraint lasting five minutes.  JRB was receiving his speech lesson when he grabbed a teacher's pen and tried to stab the aide with the pen.  He was redirected and denied access to the pen.  He was then throwing items around the room,

---

[5] In asserting this claim, Mrs. Boyer points exclusively to *Payne v. Peninsula School District*, No. 05-05780, 2013 WL 4676041 (W.D. Wash. Aug. 30, 2013), *rev'd and remanded*, 623 F. App'x 846 (9th Cir. 2015).  In that case, the district court found sufficient evidence of a Fourth Amendment violation when a teacher "locked a seven year old autistic child in a small enclosed, dark room for indeterminate periods of time . . . for an improper purpose," and the child "urinated and defecated in the room." *Id.* at *5.  Needless to say, the evidence in this case is not comparable.  Moreover, the Ninth Circuit Court of Appeals reversed the district court in *Payne*, finding qualified immunity for the teacher because "it would not have been clear to a reasonable official that placing [the student] in the safe room, as part of his aversive and behavioral intervention plan, was an unconstitutional seizure." *Payne v. Peninsula Sch. Dist.*, 623 F. App'x 846, 847-48 (9th Cir. 2015).

climbing on windows, breaking items, and hitting, kicking, and biting staff. Both the special education teacher and special education aide were trained in de-escalation techniques and safe physical restraints . . . .

06/07/2021 – A special education teacher . . . and [a registered behavioral technician] . . . used a transport restraint lasting 30 seconds. JRB was transitioning to the bus to go home. He refused to sit in his seat on the bus, threw items at the staff on the bus and hit staff. Both the special education teacher and special education aide were trained in de-escalation techniques and safe physical restraints.

Dist. Responses at 2-3.

There is no dispute that J.B. was only restrained during instances in which he posed a danger to himself and others. And Pennsylvania law explicitly permits the use of these techniques in such scenarios, unfortunate as they are. 22 Pa. Code § 14.133(c). No reasonable jury could find that these restraining events constituted an unreasonable "seizure" of J.B.[6]

### C. ADA

Mrs. Boyer also alleges that the District violated Title II of the Americans with Disabilities Act. To prevail on this claim, a plaintiff must demonstrate: (1) that the student has a disability; (2) that he was otherwise qualified to participate in a school program; and (3) that he was denied the benefits of the program or was otherwise subject to discrimination because of his disability. *Chambers v. Sch. Dist. of Phila. Bd. of Educ.*, 587 F.3d 176, 189 (3d Cir. 2009). Mrs. Boyer claims the district discriminated against J.B. due to his disability as an individual diagnosed with an emotional disturbance. She again points to the use of the "safe room" and restraint techniques on

---

[6] The mere fact that restraining techniques were used, without more, cannot sustain a 1983 claim under either the Fourth Amendment's reasonableness standard or the Fourteenth Amendment's "shocks the conscience" standard. *See Gottlieb ex rel. Calabria v. Laurel Highlands Sch. Dist.*, 272 F.3d 168 (3d Cir. 2001) ("[T]he momentary use of physical force by a teacher in reaction to a disruptive or unruly student does not effect a 'seizure' of the student under the Fourth Amendment, and therefore is a scenario to which the Fourth Amendment does not textually or historically apply." (quotations omitted)); *Kurilla v. Callahan*, 68 F. Supp. 2d 556, 561 n.4 (M.D. Pa. 1999) ("A decision not to apply Fourth Amendment jurisprudence to the momentary use of force by a teacher . . . but instead to apply substantive due process strictures, is consistent with the deference accorded school administrators and teachers even in the setting where the Fourth Amendment textually applies.").

J.B. as her primary evidence. Here, too, no reasonable jury could find that the District discriminated against J.B. because of his disability.

The District does not dispute that J.B. had a disability and was otherwise qualified to participate in a school program, but the record contains no evidence that the district treated disabled students differently than non-disabled students in their use of the "safe room" and restraint techniques. Mrs. Boyer compares the district's treatment of J.B. only to that of his twin brother, who attended school with J.B. She notes that J.B.'s brother – who had a different disability – similarly displayed "horrendous behaviors" at school and was also restrained, but unlike J.B., he was not regularly removed from the classroom or placed in the "safe room." Mrs. Boyer says this difference in treatment is explained by the fact that J.B.'s brother did not specifically have an emotional disturbance disability, while J.B. did. But if it is true that restraint techniques were used on both J.B. and his brother, then this is evidence that the district was not discriminating against J.B. for his particular disability, because if nothing else, they also restrained students with other disabilities. And the movement of J.B. out of the classroom was based on the premise that a less distracting environment would facilitate his learning. Lacking any other evidence or factual support to establish a link between J.B.'s disability and the district's use of the "safe room" and restraining techniques, no reasonable jury could conclude that the district discriminated against J.B. because of his status as a student with an emotional disturbance or as a student with a disability in general.

**D. Chapter 6400**

Lastly, Mrs. Boyer alleges violations of two statutes in the Pennsylvania Code: 55 Pa. Code §§ 6400.207 and 6400.32. ECF 9 at 3-4. This chapter of the Code applies only to individuals with intellectual disabilities or autism receiving residential care in "community homes." As this case

does not involve a residential community home, these claims lack any colorable merit and must be dismissed.

## IV.     Conclusion

For the reasons set forth above, Defendant's motion for summary judgment will be granted, and this case will be dismissed. An appropriate order follows.

/s/ Gerald Austin McHugh  
United States District Judge